# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

| | | |
|---|---|---|
| TAMMY TAYLOR and JOHN TAYLOR, individually, and as next-of-kin to the deceased, STEPHEN SULLIVAN, | § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | Case No. _____ |
| CORECIVIC OF TENNESSEE, LLC, as owner and operator of WHITEVILLE CORRECTIONAL FACILITY, FELICIA JONES, RA'KESHA SPENCER, C.J. SWAIN, DOMINIQUE BURKS, TYLER ROBINSON, COREY MOON, GREGORY JACKSON, VINCENT VANTELL, JOB JACKSON, CURTAVIOUS NEAL, JOHN PARHAM, and JANE ERVIN, | § § § § § § § § § § § § | JURY DEMANDED |
| *Defendants*. | § § | |

## COMPLAINT

For their Complaint against the Defendants, the Plaintiffs state to the Court and the Jury as follows:

## I. INTRODUCTION

1.      On June 16, 2021—after being denied his anti-seizure medication—Stephen Sullivan suffered two refractory seizures at Whiteville Correctional Facility, a private prison operated by CoreCivic of Tennessee, LLC ("CoreCivic").  During Mr. Sullivan's second seizure, Mr. Sullivan suffered a serious head injury that caused his brain to swell.

2.      In advance of Mr. Sullivan's preventable death on June 17, 2021, the Defendants ignored multiple urgent requests for medical assistance made by both Mr.

Sullivan himself and on Mr. Sullivan's behalf by other inmates who recognized that Mr. Sullivan required urgent medical attention.

3.      The Defendants specifically ignored Mr. Sullivan's first two seizures on June 16, 2021, and they additionally ignored a developing blood clot in Mr. Sullivan's leg for which he had sought urgent medical attention.  Although Mr. Sullivan needed to be hospitalized immediately as a result of these serious medical issues, the Defendants declined to hospitalize Mr. Sullivan on June 16, 2021, and they did not afford him any medical treatment on June 16, 2021 at all.

4.      On the morning of June 17, 2021, Mr. Sullivan suffered his third seizure in two days.  The Defendants responded to Mr. Sullivan's third seizure, among other things, by dropping Mr. Sullivan from a height of approximately 3 feet while carrying him on a back board; mocking Mr. Sullivan's weight; complaining that they did not want to get Mr. Sullivan's vomit on them; complaining about the smell of Mr. Sullivan's vomit; delaying Mr. Sullivan's hospitalization; and twice administering Mr. Sullivan an anti-overdose treatment despite their actual knowledge that he was not overdosing and had not consumed drugs.  Upon his delayed arrival at a hospital approximately two hours later, Mr. Sullivan was pronounced dead.

5.      CoreCivic—which changed its name from Corrections Corporation of America in 2017 after that name became synonymous with the most insidious aspects of America's private prison industry—is the nation's most notorious private prison operator. To maintain its profit margin—and as a result of its chronic and profit-motivated deliberate indifference to inmate health and safety—CoreCivic serially underinvests in prison staff, security, and inmate healthcare at its prisons, leading to predictable and horrific results year after year.  Accordingly, among many other complaints, this Court

has repeatedly been made aware of "inadequate medical staffing that was endemic of broader issues with staffing levels at CoreCivic facilities" generally, it has been made aware of the federal BOP's "complaints about poor health services" at multiple CoreCivic facilities, it has been made aware of CoreCivic's "failures to maintain accurate records of medication administrations," and it has been made aware of at least one "inadequate emergency response in the case of an inmate who eventually died." *See, e.g., Grae v. Corr. Corp. of Am.*, 330 F.R.D. 481, 486–87 (M.D. Tenn. 2019).

6.     Due to CoreCivic's pattern of deliberate indifference to inmates' serious health needs, repeated pleas to provide Mr. Sullivan medical assistance went unanswered.

7.     Mr. Sullivan was not hospitalized on June 16, 2021—even after experiencing a second seizure that caused him to suffer a serious head injury—because critical staff members were not present to address his medical needs and because hospitalizing Mr. Sullivan presented an inconvenient and expensive imposition that the Defendants hoped to avoid.

8.     If Mr. Sullivan been hospitalized as necessary on June 16, 2021, and if the Defendants had not delayed Mr. Sullivan's hospitalization after he suffered his third seizure on June 17, 2021, Mr. Sullivan would not have died.

## II.  PARTIES

9.     Plaintiffs Tammy Taylor and John Taylor are the parents and next-of-kin to the decedent Stephen Sullivan, a 24-year-old man who died while incarcerated at Defendant CoreCivic's Whiteville Correctional Facility on June 17, 2021.  The Plaintiffs are citizens of Tennessee and residents of Trousdale County, Tennessee.

10.     Defendant CoreCivic of Tennessee, LLC, is a private prison corporation. CoreCivic owns and operates Whiteville Correctional Facility, the private prison that

- 3 -

ignored Plaintiff's medical emergency resulting in his death. CoreCivic is a citizen of Tennessee with its principal place of business and corporate headquarters located in Williamson County, Tennessee, at 5501 Virginia Way, Brentwood, TN, 37027-7680. CoreCivic may be served through its registered agent at CoreCivic of Tennessee, LLC, Registered Agent: C T CORPORATION SYSTEM, 300 MONTVUE RD, KNOXVILLE, TN 37919-5546.

11.     Defendant Felicia Jones is a citizen of Tennessee who is employed as a nurse at CoreCivic's Whiteville Correctional Facility.

12.     Defendant Ra'Kesha Spencer is a citizen of Tennessee who is employed as a nurse at CoreCivic's Whiteville Correctional Facility.

13.     Defendant C.J. Swain is a citizen of Tennessee who is employed as a correctional officer at CoreCivic's Whiteville Correctional Facility.

14.     Defendant Dominique Burks is a citizen of Tennessee who is employed as a case manager at CoreCivic's Whiteville Correctional Facility.

15.     Defendant Tyler Robinson is a citizen of Tennessee who is employed as a correctional officer at CoreCivic's Whiteville Correctional Facility.

16.     Defendant Corey Moon is a citizen of Tennessee who is employed as a correctional officer at CoreCivic's Whiteville Correctional Facility.

17.     Defendant Gregory Jackson is a citizen of Tennessee who is employed as a correctional officer at CoreCivic's Whiteville Correctional Facility.

18.     Defendant Vincent Vantell is a citizen of Tennessee who is employed as the warden at CoreCivic's Whiteville Correctional Facility.

19.     Defendant Job Jackson is a citizen of Tennessee who is employed as a correctional officer at CoreCivic's Whiteville Correctional Facility.

- 4 -

20.     Defendant Curtavious Neal is a citizen of Tennessee who is employed as a case manager at CoreCivic's Whiteville Correctional Facility.

21.     Defendant John[1] Parham is a citizen of Tennessee who is employed as a sergeant at CoreCivic's Whiteville Correctional Facility.

22.     Defendant Jane[2] Ervin is a citizen of Tennessee who is employed as a nurse at CoreCivic's Whiteville Correctional Facility.

### III.  JURISDICTION AND VENUE

23.     This Court has jurisdiction over the Plaintiffs' federal claims in this civil action pursuant to 28 U.S.C. § 1331.

24.     This Court has supplemental jurisdiction to adjudicate the Plaintiffs' state law claims related to the Plaintiffs' federal claims in this action pursuant to 28 U.S.C. § 1367(a).

25.     As the judicial district in which one or more Defendants reside, and all Defendants being residents of the State of Tennessee, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1).

26.     As the judicial district in which Defendant CoreCivic makes its calculated, profit-motivated decisions to underinvest in staffing and healthcare in its Tennessee facilities, venue is independently proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) as the district in which a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred.

27.     The Plaintiffs have authority to maintain their own claims individually and

---

[1] John is a pseudonym.  Defendant Parham's actual first name is unknown.  Plaintiffs will amend their Complaint to state Defendant Parham's first name once it is ascertained through discovery.

[2] Jane is a pseudonym.  Defendant Ervin's actual first name is unknown.  Plaintiffs will amend their Complaint to state Defendant Ervin's first name once it is ascertained through discovery.

to maintain this wrongful death action as next-of-kin to the deceased pursuant to Tenn. Code Ann. § 20-5-107(a).

## IV.  FACTUAL ALLEGATIONS

28.    At all times relevant to this Complaint, Stephen Sullivan was an inmate housed at Whiteville Correctional Facility, a private, for-profit prison managed and operated by Defendant CoreCivic.

29.    On June 16, 2021, Mr. Sullivan complained to Defendant CoreCivic of severe pain in his right calf, which was visibly "bruised and had a knot."  Mr. Sullivan had also complained about the same calf pain during the preceding days, but he had not received any medical attention in response.

30.    With the assistance of his cellmate—Mr. Christopher Covington—Mr. Sullivan filed a medical request detailing the severe pain, bruise, and knot in his calf and indicated to the Defendants that he required emergency medical assistance regarding it. Given the visible severity of Mr. Sullivan's calf condition and the distress he was experiencing regarding it, Mr. Covington also filed a similar medical request on Mr. Sullivan's behalf thereafter.

31.    The Defendants did not provide Mr. Sullivan any medical attention or treatment for Mr. Sullivan's calf condition on June 16, 2021, or at any time before or afterward.

32.    After filing a medical request regarding the pain, bruising, and knot in his right calf on June 16, 2021, Mr. Sullivan suffered a refractory seizure.

33.    Mr. Sullivan's seizure was predictable and avoidable.  Mr. Sullivan suffered seizures since birth, and he was diagnosed with a seizure disorder at the age of 16.  Prior to his incarceration at Whiteville Correctional Facility, Mr. Sullivan was prescribed

- 6 -

Depakote to treat his seizures.

34. In the days leading up to his death, however, Defendant CoreCivic denied Mr. Sullivan his anti-seizure medication. Defendant CoreCivic denied Mr. Sullivan his anti-seizure medication because Whiteville Correctional Facility was severely understaffed and because staff members were spread too thin to ensure compliance with their duty to provide inmates constitutionally adequate health care, including providing prescribed medication.

35. While Mr. Sullivan was seizing, his cellmate recognized that Mr. Sullivan was having a seizure, turned Mr. Sullivan on his side, and attempted to hold him steady. Thereafter, another inmate ran to get medical help.

36. Although the inmate who ran to get help for Mr. Sullivan yelled for help and banged on the window to get the attention of a guard, counselor, or any other employee who could obtain aid for Mr. Sullivan, no employee of Defendant CoreCivic responded to provide medical treatment or to inquire about what had occurred. The reason why no employee responded or was available to provide medical attention to Mr. Sullivan was because Whiteville Correctional Facility was severely understaffed. As a consequence, there were no employees "in the booth, there's nobody in the celly port, nothing."

37. Such understaffing is rampant throughout CoreCivic's Tennessee facilities in general and at Whiteville Correctional Facility in particular. In recent years, CoreCivic has been assessed "millions" of dollars in liquidated damages penalties by the Tennessee Department of Correction for understaffing and other contractual non-compliance at its Tennessee facilities.[3]

---

[3] *See* **Ex. 1** (Deposition of Tony Parker), at 20:9–23.

38.     Generally speaking, the less money that CoreCivic spends on staff, inmate healthcare, and inmate safety at Whiteville Correctional Facility, the higher CoreCivic's profit margin.  In all instances, CoreCivic acts to maximize profit for the benefit of its shareholders.

39.     After suffering his first seizure, Mr. Sullivan eventually stabilized in his cell with the aid of his cellmate, Mr. Covington.  No Defendant provided Mr. Sullivan any medical assistance on June 16, 2021, after his first seizure.

40.     Later in the day on June 16, 2021, Mr. Sullivan suffered a second refractory seizure, causing him to fall from his top bunk.

41.     The fall caused Mr. Sullivan to hit his head and suffer a visible, bloody contusion to his head.  While Mr. Covington moved Mr. Sullivan's bed mat to the ground to provide him a more comfortable place to lay down, another inmate went to go seek medical aid for Mr. Sullivan.  After falling from his top bunk and hitting his head while seizing, Mr. Sullivan vomited.

42.     Once Mr. Sullivan stopped seizing, Mr. Covington ran for help as well.  Mr. Covington was able to locate Defendant C.J. Swain, a correctional officer employed by Defendant CoreCivic.

43.     At approximately 3:22 p.m., Mr. Covington indicated to Defendant Swain that "his celly needed medical attention."  Mr. Covington specifically explained that Mr. Sullivan had just suffered a second seizure, that no one was around or responded to provide help after his first seizure, and that Mr. Sullivan required urgent medical attention.

44.     Defendant Swain responded that he would get Defendant Dominique Burks, who was a counselor at the prison.  Mr. Covington emphasized that Mr. Sullivan needed

- 8 -

medical assistance, not a counselor.

45.     Defendant Swain notified Defendant Burks that Mr. Sullivan was seriously ill.  However, Defendant Swain did not provide Mr. Sullivan any assistance himself; he carried on with conducting his count despite knowing that Mr. Sullivan urgently needed medical attention; and he took no further action to ensure that Mr. Sullivan was provided the prompt—or any—medical care that he urgently required on June 16, 2021.

46.     Defendant Swain provided no medical assistance to Mr. Sullivan and did not assist in obtaining medical assistance for Mr. Sullivan because he concluded that, at that time, Mr. Sullivan appeared "responsive [and] alert."

47.     When Defendant Burks later came by Mr. Sullivan's cell, Defendant Burks "advised [Mr. Covington] to move and inmate Sullivan picked his head away from the cover and he then put it back down under the cover."  Defendant Burks's handwritten report makes no mention of any further action being taken to ascertain what type of medical emergency Mr. Sullivan was experiencing or to determine what type of medical care he needed, and no medical care was provided.

48.     Defendant Burks did not take any action to assist Mr. Sullivan on June 16, 2021.  Movement of Mr. Sullivan's head from his bed was the only action that Defendant Burks observed and documented.  Defendant Burks made no further inquiry into the fact that Mr. Sullivan had just suffered two seizures, had vomited, or had fallen from his top bunk and injured his head.  Despite Mr. Sullivan's serious medical needs, Defendant Burks provided Mr. Sullivan no medical assistance whatsoever.

49.     Instead of calling for medical assistance that Mr. Sullivan urgently needed or taking Mr. Sullivan to receive medical treatment from medical staff members, Defendant Burks ordered Mr. Sullivan and Mr. Covington to lockdown in their cell.  Mr.

Covington "pointed out all the vomit [and] said yet again [Mr. Sullivan] needs medical attention."

50. In response to Mr. Covington identifying and emphasizing Mr. Sullivan's urgent need for medical attention, Defendant Burks again "told [Mr. Covington] to lockdown." Mr. Covington "told her no because it was [Mr. Sullivan's] life at stake."

51. Rather than calling for medical assistance that Mr. Sullivan urgently needed, and despite Mr. Sullivan's urgent need for medical assistance having been specifically communicated to Defendant Burks, Defendant Burks threatened to take both Mr. Covington and Mr. Sullivan "to the hole"—meaning in penal solitary confinement—for refusing an order to lockdown.

52. In response, Mr. Sullivan asked Mr. Covington to comply with Defendant Burks' order because "he didn't want to go to the hole," where Mr. Sullivan feared he would not be able to get medical attention.

53. Despite Mr. Covington's pleas to Defendant Swain, Defendant Burks, and others that Mr. Sullivan needed immediate medical attention, and despite Defendant Burks assuring Mr. Sullivan she would advise medical to help him, "no one ever came to assist."

54. On June 16, 2021, Mr. Sullivan indicated to Defendant Ervin—a nurse at the facility—that he had suffered seizures and been throwing up that day. Defendant Ervin did not provide Mr. Sullivan any medical treatment, either, and made no further inquiries.

55. Thus, Mr. Sullivan's two seizures; the developing blood clot in his calf; and Mr. Sullivan's serious head injury were all left untreated on June 16, 2021—even though Mr. Sullivan urgently needed to be hospitalized and his urgent need for medical attention had been communicated repeatedly to multiple Defendants.

- 10 -

56.     The following morning, on June 17, 2021, Mr. Covington retrieved breakfast for himself and Mr. Sullivan.  Another inmate asked Mr. Sullivan how he was doing from the day before, because "the whole pod [knew] that he had a seizure."

57.     While eating breakfast, when Mr. Sullivan attempted to fill his water cup, Mr. Sullivan's "leg 'gave out' and he kind of went down to his butt."

58.     Although Mr. Covington attempted to stabilize Mr. Sullivan, "all of the sudden he went limp [and] hit his head on the wall [and] began to shake as if he was having another seizure."

59.     Once again, because Whiteville Correctional Facility was severely understaffed and critical posts that Defendant CoreCivic was obligated to keep staffed were vacant, needed staff members were not around.  Accordingly, once more, an inmate ran to get help while Mr. Covington "held [Mr. Sullivan] as he shook and vomited."

60.     While waiting for help, Mr. Sullivan "lost the color in his face [and] his lips were blue."

61.     At 7:51 a.m. on June 17, 2021, a medical code was called to alert staff that medical treatment was needed in Mr. Sullivan's cell.  This represented the first time after Mr. Sullivan complained of urgent leg pain and suffered three seizures in a two-day period that a medical code was called, and it was the first time that any medical assistance was even attempted.

62.     Defendant Parham eventually arrived at Mr. Sullivan's cell in response to the medical code call.  Upon arrival, Defendant Parham did not facilitate Mr. Sullivan's immediate hospitalization.  Instead, he made "jokes about how bad the cell smelled because [Mr. Sullivan] had vomited."

63.     Without having any reason to believe that Mr. Sullivan had consumed

- 11 -

drugs, Defendant Parham "asked [Mr. Covington] what drugs [Mr. Sullivan] was on."

64. In response, Mr. Covington informed Defendants Corey Moon and Job Jackson—who had arrived by that point—and Defendant Parham that Mr. Sullivan "doesn't get high [and] definitely [wasn't] overdosing."

65. Further staff members including Correctional Officer Tyler Robinson, Case Manager Curtavious Neal, Shift Supervisor Captain Corey Moon, Correctional Officer Gregory Jackson, Correctional Officer Job Jackson, and Nurse Ra'Kesha Spencer arrived in response to Mr. Sullivan's medical code call thereafter.

66. Upon arrival, all Defendants "assumed it was an overdose" and treated it as such despite having been specifically advised of Mr. Sullivan's multiple seizures and despite Mr. Covington's repeated assurances that Mr. Sullivan does not use drugs and was not overdosing.

67. Despite overwhelming contrary evidence, the Defendants nonetheless assumed that Mr. Sullivan was overdosing; they treated him as if he were overdosing; and they acted as if Mr. Sullivan did not present an urgent medical need that required immediate hospitalization as a consequence.

68. The Defendants reflexively assumed that Mr. Sullivan was overdosing because inmate overdoses are a common occurrence at CoreCivic facilities, where drug distribution is rampant and CoreCivic staff members participate in it.

69. Due to CoreCivic's poor working conditions and low compensation, CoreCivic employees regularly smuggle drugs into CoreCivic prison facilities—including Whiteville Correctional Facility—to sell to inmates and to supplement their income. *See, e.g., Former Hardeman County Correctional Officer Sentenced After Being Found Guilty of Smuggling Drugs into Whiteville Correctional Facility*, WREG NEWS CHANNEL

- 12 -

3 (October 20, 2020), https://wreg.com/news/former-hardeman-county-correctional-officer-sentenced-after-being-found-guilty-of-smuggling-drugs-into-whiteville-correctional-facility/.

70. Eventually, Defendants Moon, Jackson, and Parham placed Mr. Sullivan on a back board to transport him for medical treatment for what they incompetently assumed was a drug overdose despite overwhelming contrary evidence.

71. Defendant Jackson left and returned to his office once Mr. Sullivan was placed on the back board with no indication that Mr. Sullivan was being properly treated or treated at all.

72. While being carried on the back board, Mr. Sullivan vomited off the side of the board while being carried at a height of at least 3 feet off the ground.

73. After Mr. Sullivan vomited, one of the Defendant Officers holding the board by Mr. Sullivan's head "let go of the board [and] stepped out of the path of the vomit. This caused all the other personnel to drop him, so he was dropped from about 3 feet high at the top of the stairs."

74. Despite multiple Defendants witnessing—or participating—in Mr. Sullivan being dropped from a height of three feet because an officer did not want to get vomit on him, all Defendants who prepared incident reports after Mr. Sullivan's death willfully omitted that fact from their incident reports in an effort to conceal it.

75. Defendant CoreCivic has also illicitly withheld public records and concealed video footage of the incident under the guise of security concerns that CoreCivic is actually aware are not genuine.

76. Defendants Moon, Jackson, and Parham waited several minutes to pick Mr. Sullivan back up and resume transporting him for overdose treatment. The delay was

attributable to the Defendants joking about Mr. Sullivan's weight and the smell of his vomit. The Defendant Officers eventually picked Mr. Sullivan up again once they had made "jokes about what they [were] going to do and how bad…it stunk" because of the vomit.

77. Despite having been told numerous times that Mr. Sullivan had not consumed any drugs and was not overdosing, and despite the fact that Mr. Sullivan did not have any "documented history indicating drug abuse[,]" Defendant Nurse Ra'Kesha Spencer administered a dose of Narcan—an anti-overdose treatment—at 8:27 a.m. in lieu of hospitalizing Mr. Sullivan. Defendant Nurse Felicia Jones assisted in the administration of Narcan to Mr. Sullivan.

78. Because Mr. Sullivan had not consumed drugs and was not overdosing, the dose of Narcan that the Defendants provided Mr. Sullivan made no conceivable medical sense under the circumstances; it did not help Mr. Sullivan; and it served only to further delay Mr. Sullivan's urgently needed hospitalization.

79. Despite having been told numerous times that Mr. Sullivan had not consumed any drugs and was not overdosing, despite the fact that Mr. Sullivan did not have any "documented history indicating drug abuse[,]" and despite the fact that the first dose of Narcan had done nothing to improve Mr. Sullivan's serious medical condition, Defendant Spencer administered Mr. Sullivan a second dose of Narcan at 8:30 a.m.

80. Because Mr. Sullivan had not consumed drugs and was not overdosing, though, the second dose of Narcan Defendant Spencer provided Mr. Sullivan made no conceivable medical sense under the circumstances; the second dose did not help him, either; and it, too, served only to further delay Mr. Sullivan's urgently needed hospitalization.

- 14 -

81.     At approximately 8:30 a.m., correctional officer Defendant Tyler Robinson and case manager Defendant Curtavious Neal arrived at the medical treatment room.

82.     Approximately five minutes later, Mr. Sullivan began to vomit again and became unresponsive.

83.     Thereafter, Mr. Sullivan was "placed on a stretcher and became alert again."

84.     At 8:40 a.m., Mr. Sullivan once again became unresponsive "with no pulse or respirations.  CPR was initiated and local EMS was called."

85.     An ambulance arrived by 8:45 a.m. and transported Mr. Sullivan to Bolivar General Hospital while medics performed CPR.  Defendants Neal and Robinson went to the hospital with EMS and Mr. Sullivan, but they did not provide any information to medics related to Mr. Sullivan's seizures.

86.     Mr. Sullivan arrived at the hospital at 9:24 a.m.  Four minutes later, at 9:28 a.m., a doctor pronounced Mr. Sullivan dead.

87.     At no time on June 16, 2021 or June 17, 2021 did any employee of Defendant CoreCivic administer any useful medical aid to Mr. Sullivan, who was experiencing an urgent, multi-issue medical emergency over an approximately 24-hour period that required urgent hospitalization.

88.     Following Mr. Sullivan's death, Defendants Dominique Burks, Gregory Jackson, Felicia Jones, Corey Moon, Curtavious Neal, Tyler Robinson, Ra'Kesha Spencer, and C.J. Swain all generated incident reports that concealed and were calculated to conceal both their incompetent response to Mr. Sullivan's urgent medical needs and their deliberate indifference to Mr. Sullivan's serious medical conditions.

89.     The Defendants' incident reports uniformly omitted mention of Mr. Sullivan's first or second seizures the day before his death, despite the fact that the

- 15 -

Defendants received multiple reports from multiple inmates regarding them.

90. The Defendants' incident reports uniformly omitted mention of Mr. Sullivan's calf pain and bruising, despite the fact that the Defendants received reports from Mr. Sullivan and his cellmate requesting emergency medical care regarding it.

91. The Defendants' incident reports uniformly omitted mention of the fact that the Defendant Officers Corey Moon, Job Jackson, and Sergeant Parham dropped Mr. Sullivan during his transport.

92. The Defendants' incident reports uniformly omitted mention of Mr. Sullivan's serious head injury.

93. The Defendants' incident reports uniformly omitted mention that they had delayed Mr. Sullivan's medical treatment because they were occupied with joking about his weight and complaining about the smell of his vomit.

94. Mr. Sullivan's cellmate, Mr. Covington, meticulously documented the Defendants' reckless misconduct and deliberate indifference to Mr. Sullivan's medical need in a personal notebook, including documenting specific employees, dates, and times "regarding this and other incidents." Mr. Covington began documenting situations in the notebook when he was previously refused medical care that he had requested for his own unrelated concerns.

95. Aware that Mr. Covington had meticulously documented the Defendants' deliberate indifference to Mr. Sullivan's serious medical needs, Defendant CoreCivic, through its employees, illicitly seized Mr. Sullivan's notebook and are believed to have spoliated it. Despite the facts that Mr. Covington had properly ordered and received the notebook through the mail and that it was a legal and permissible item for him to have in his cell, Mr. Covington has never been able to get his confiscated notebook and the

- 16 -

information contained in it returned to him. He has requested it back, and he has been refused.

96. Defendant CoreCivic and its employees have additionally punished and retaliated against Mr. Covington since that time. While Mr. Covington was being held up front waiting to give a statement regarding what had occurred, his cell was supposed to be locked off from all other inmates. Instead, CoreCivic employees opened the cell and it was ransacked, with most of Mr. Covington's personal belongings such as his television being taken. Although Mr. Covington notified CoreCivic's employees and asked for his things back, Mr. Covington received no assistance.

97. Given the traumatic nature of Mr. Sullivan's death and having witnessed Mr. Sullivan die a preventable death due to the Defendants' deliberate indifference to Mr. Sullivan's serious medical needs, Mr. Covington nonetheless maintains a vivid memory of many details nearly a full year later and has provided multiple consistent statements regarding them. Mr. Covington's statements and his recollection of events are attached hereto as **Exhibit #2, Exhibit #3**, and **Exhibit #4** and are incorporated into this Complaint by reference.

98. After conducting an autopsy of Mr. Sullivan, Medical Examiner Juliette Scantlebury, M.D., identified "no signs of trauma, foul play, abuse, neglect nor alcohol and drug use."

99. Significantly, though, Mr. Sullivan's visible, seizure-induced head contusion—photographed by Mr. Sullivan's mother at Mr. Sullivan's funeral home after his death and pictured below—was not mentioned anywhere in the Medical Examiner's report. The Medical Examiner did, however, observe that Mr. Sullivan had cerebral edema, which resulted from his seizure-induced head injury.

- 17 -



100. Also significantly, the Medical Examiner was not provided an accurate account of events by the Defendants, which necessarily affected her resulting summary, interpretations, and cause of death determination.

101. Of particular note, the Medical Examiner's report makes no mention of the two seizures Mr. Sullivan suffered the day before his death or his head injury resulting from one of them. Instead, the Medical Examiner's report states that Mr. Sullivan reportedly "was not feeling well for several days."

102. At Mr. Sullivan's autopsy, Dr. Scantlebury identified "speriginous adherent thrombi," or blood clots adhering to the pulmonary arteries in both lungs. Accordingly— and notwithstanding Mr. Sullivan's additionally observed cerebral edema—she concluded that Mr. Sullivan's cause of death was likely a "pulmonary thromboembolism," a phenomenon caused by blood clots, often from the legs, traveling to the lungs.

103. Although a pulmonary embolism is treatable, it requires prompt treatment

to avoid serious injury or death. It also cannot be treated with Narcan.

104. Given Mr. Sullivan's observed cerebral edema and his serious head injury preceding it, it is probable that Mr. Sullivan's actual cause of death was a cerebral edema caused by Mr. Sullivan's seizure-induced head injury. It is also probable that if the Medical Examiner had been given accurate clinical history regarding Mr. Sullivan and the events leading up to his death, she would have reached a different cause of death determination.

105. Although cerebral edema is treatable, it requires prompt treatment to avoid serious injury or death. Cerebral edema cannot be treated with Narcan, either.

106. If Mr. Sullivan had been promptly hospitalized for his serious medical needs on June 16, 2021, rather than having those serious medical needs ignored and left untreated, Mr. Sullivan would not be dead.

107. If Mr. Sullivan had been promptly hospitalized for his serious medical needs on June 17, 2021, rather than having his treatment delayed by, *inter alia*, the Defendants' higher-priority needs to joke about his weight; to complain about his vomit; and their unjustifiable assumption that Mr. Sullivan needed to be treated for an overdose that all evidence indicated he was not experiencing, Mr. Sullivan would not be dead.

## V. CAUSES OF ACTION

### CLAIM #1: 42 U.S.C. § 1983—DEFENDANTS' DELIBERATE INDIFFERENCE TO MR. SULLIVAN'S MEDICAL NEEDS ON JUNE 16, 2021

108. The Plaintiffs incorporate and reallege the foregoing allegations as if fully set forth herein.

109. The Defendants have a constitutional duty imposed by the Eighth and Fourteenth Amendments to provide adequate medical treatment to inmates in their

- 19 -

custody and care while exercising the traditional state function of imprisoning inmates.

110. Because Defendant CoreCivic performs a traditional state function while operating a state prison, at all times relevant to this Complaint, Defendant CoreCivic and all other Defendants in this action acted under color of state law.

111. The Eighth Amendment imposes several minimum requirements on prison officials, including requiring them to: (i) provide humane conditions of confinement, (ii) ensure that inmates receive adequate medical care, and (iii) take reasonable measures to guarantee the safety of inmates.

112. An inmate's Eighth Amendment claim based upon deliberate indifference to medical needs is "akin to recklessness," and it carries both objective and subjective components.

113. On June 16, 2021, Mr. Sullivan had an objectively serious need for medical treatment that the Defendants failed to provide.

114. Mr. Sullivan's painful, bruised, and knotted calf—regarding which the Plaintiff and his cellmate reported a need for emergency medical care on June 16, 2021 and in preceding days—was a medical condition that was "sufficiently serious" to warrant treatment.

115. Mr. Sullivan's two seizures and resulting head injury on June 16, 2021 were medical conditions that were "sufficiently serious" to warrant treatment.

116. On June 16, 2021, Mr. Sullivan had an objectively serious need to be hospitalized for his serious medical conditions, but the Defendants declined to hospitalize him or provide him any medical treatment at all.

117. Through their deliberate indifference to Mr. Sullivan's serious medical needs on June 16, 2021, the Defendants failed to provide Mr. Sullivan with

- 20 -

constitutionally adequate medical care in violation of the Eighth Amendment.

118.   At minimum, Defendants Swain, Burks, and Ervin were specifically informed of Mr. Sullivan's serious medical needs on June 16, 2021, but they entirely ignored and disregarded them.

119.   Acting with deliberate indifference to Mr. Sullivan's serious medical needs, the Defendants consciously and willfully declined to provide Mr. Sullivan any medical treatment on June 16, 2021 whatsoever.

120.   On June 16, 2021, as a result of, *inter alia*, Mr. Sullivan's specific request for emergency medical attention; pleas from other inmates to provide Mr. Sullivan emergency medical attention; and the Defendants' knowledge of Mr. Sullivan's two seizures; the Defendants subjectively perceived facts from which to infer a substantial risk to Mr. Sullivan's health; they in fact drew an inference; and they disregarded the risk.

121.   From June 16, 2021 until Mr. Sullivan's death, the Defendants were actually aware of Mr. Sullivan's medical history; they knew that he had been prescribed and required medication to control his seizures; they knew that his medication had not been provided to him; and they knew that as a result of one of his resulting seizures, Mr. Sullivan suffered a significant head injury.  These medical needs were sufficiently serious to warrant immediate intervention and treatment.

122.   The risks of serious harm that Mr. Sullivan faced as a result of being deprived of his anti-seizure medication; as a result of his resulting seizures; and as a result of his serious seizure-induced head injury were obvious to at least several Defendants on June 16, 2021.

123.   On June 16, 2021, the Defendants consciously disregarded all of the Plaintiff's serious medical needs by failing to provide him his anti-seizure medication and

by failing to provide him any medical treatment whatsoever.

124.　The Defendants' deliberate indifference to Mr. Sullivan's medical needs on June 16, 2021 and failure to hospitalize him exacerbated Mr. Sullivan's ever-worsening condition; allowed his brain to swell; allowed blood clots to form and travel through Mr. Sullivan's body; and ultimately, resulted in Mr. Sullivan's death.

125.　In contrast to the State of Tennessee, Defendant CoreCivic is not entitled to Eleventh Amendment immunity and may be held liable under § 1983 if its official policies or customs resulted in the Plaintiffs' injuries.

126.　Defendant CoreCivic has an unconstitutional policy or practice of maintaining chronically inadequate staffing levels, which prevent inmates like Mr. Sullivan from receiving prompt medical attention when they experience medical emergencies like those Mr. Sullivan experienced on June 16, 2021.

127.　Defendant CoreCivic has an unconstitutional policy or practice of underinvesting in medical care and providing deficient medical treatment to inmates at its facilities because it is cheaper to do so.

128.　Due to Defendant CoreCivic's policies and practices of maintaining chronically inadequate staffing and providing deficient medical care—issues documented in, among other things, an OIG Audit and a BOP after-action report following a prison riot that led to multiple deaths and serious injuries at a federal facility, *see* Office of the Inspector General, *Audit of the Federal Bureau of Prisons' Contract with CoreCivic, Inc. to Operate the Adams County Correctional Center in Natchez, Mississippi* (December 2016), https://oig.justice.gov/reports/2016/a1708.pdf—in 2016, the federal government announced a policy that it would phase out contracts with CoreCivic.

129.　Because CoreCivic had misrepresented its actual performance and the

- 22 -

quality of its services to shareholders, Defendant CoreCivic's parent corporation was thereafter sued for and recently paid $56 million to settle a shareholder fraud class action claim arising from these issues. *See* Travis Loller, *CoreCivic to settle shareholders lawsuit for $56 million*, THE TENNESSEAN (April 20, 2021) https://www.tennessean.com/story/news/2021/04/20/corecivic-lawsuit-private-prison-operator-settle-56-million/7302711002/.

130. Similar deficiencies at CoreCivic's Tennessee facilities are reported but left unremedied year after year after year.[4]

---

[4] *See, e.g.,* Cassandra Stephenson, *Inmate death ruled homicide in a Tennessee CoreCivic prison where rate is twice as high as TDOC's, records show*, JACKSON SUN (Jan. 28, 2020), https://www.jacksonsun.com/story/news/crime/2020/01/28/corecivics-tennessee-prisons-have-twice-homicide-rate-tdocs/2776928001/ ("The corporation's four Tennessee facilities hold roughly 35% of the state's prison population but accounted for about 63% of the state's prison homicides."); Prison Legal News, *CoreCivic Prisons in Tennessee Have Twice as Many Murders, Four Times the Homicide Rate as State-Run Facilities*, PLN (Aug. 6, 2019), https://www.prisonlegalnews.org/news/2019/aug/6/corecivic-prisons-tennessee-have-twice-many-murders-four-times-homicide-rate-state-run-facilities/ ("from 2014 through June 2019, there were twice as many murders in the four Tennessee prisons operated by CoreCivic (formerly Corrections Corporation of America) than in the 10 prisons run by the Tennessee Department of Correction (TDOC). Also, the homicide rate in CoreCivic facilities was over four times higher than the rate for TDOC prisons."); Brinley Hineman, *After Tennessee prison suicide, CoreCivic counselor fabricated health records of treatment: TDOC*, THE TENNESSEAN (Aug. 25, 2020), https://www.tennessean.com/story/news/crime/2020/08/26/after-tennessee-prisoners-suicide-corecivic-worker-faked-health-records/3404186001/; Demetria Kalodimos, *Woman says she paid off gangs to keep son safe in prison*, WSMV (Oct. 5, 2017), https://www.wsmv.com/news/woman-says-she-paid-off-gangs-to-keep-son-safe-in-prison/article_a4e670ea-78be-5087-86e5-a65ecd485475.html; Joseph Wenzel, *Over 1,200 staff, inmates test positive for COVID-19 at Trousdale Turner Correctional Center*, WSMV (May 1, 2020), https://www.wsmv.com/news/over-1-200-staff-inmates-test-positive-for-covid-19-at-trousdale-turner-correctional-center/article_568c03d2-8bde-11ea-a447-4b7eaabeb67b.html; Adam Tamburin, *Tennessee prison inmate dies after fight at Trousdale Turner*, THE TENNESSEAN (Jan. 26, 2020), https://www.tennessean.com/story/news/2020/01/26/tennessee-prison-inmate-dies-after-fight-trousdale-turner-correctional-center/4581013002/; Dave Boucher, *New Tennessee CCA prison stops taking inmates amid 'serious issues,'* THE TENNESSEAN (May 24, 2016), https://www.tennessean.com/story/news/politics/2016/05/24/new-tennessee-private-prison-stops-taking-inmates/84867834/; Chris Conte, *Prisons for profit: Concerns mount about Trousdale Turner Correctional Center, operator CoreCivic*, WTVF (Jun. 13, 2019), https://www.newschannel5.com/longform/prisons-for-profit-concerns-mount-about-trousdale-turner-correctional-center-operator-corecivic; Staff Report, *Scathing state audit slams Tennessee prisons, CoreCivic for staffing, sexual assaults, and deaths in jails*, WTVF (Jan. 10, 2020), https://www.newschannel5.com/news/scathing-state-audit-slams-tennessee-prisons-corecivic-for-staffing-sexual-assaults-and-deaths-in-jails; Jamie McGee, *CoreCivic shareholders granted class action status in fraud lawsuit*, THE TENNESSEAN (May 27, 2019), https://www.tennessean.com/story/money/2019/03/27/corecivic-class-action-securities-fraud-lawsuit/3289913002/; Chris Gregory, *Family seeks answers in loved one's death at Trousdale prison*, LEBANON DEMOCRAT (Jan. 2, 2021), https://www.lebanondemocrat.com/hartsville/family-seeks-answers-

in-loved-ones-death-at-trousdale-prison/article_1ffe90f7-0e9f-5021-bb94-9ec1b4d23139.html; Demetria Kalodimos, *Inmates at CoreCivic prisons say they sometimes go months without medical care*, WSMV (Jun. 22, 2017), https://www.wsmv.com/news/inmates-at-corecivic-prisons-say-they-sometimes-go-months-without-medical-care/article_8d28e630-bd12-5f1c-8b68-92b9336553e1.html; Prison Legal News, *Incorrect Cause of Tennessee Prisoner's Death Reported by CoreCivic Employees*, PLN (Jun. 7, 2018), https://www.prisonlegalnews.org/news/2018/jun/7/incorrect-cause-tennessee-prisoners-death-reported-corecivic-employees/; Staff Report, *Private prison company CoreCivic's history of problems in Tennessee*, THE TENNESSEAN (Jan. 16, 2020), https://www.tennessean.com/story/news/local/2020/01/17/private-prison-corecivic-history-problems-tennessee/4470277002/; Stephen Elliott, *State audit criticizes CoreCivic facilities*, THE NASHVILLE POST (Nov. 14, 2017), https://www.nashvillepost.com/business/prison-management/article/20982796/state-audit-criticizes-corecivic-facilities; Matt Blois, *CoreCivic reports $25M in profits as COVID infects 2,500+ inmates*, THE NASHVILLE POST (Jun. 30, 2020), https://www.nashvillepost.com/business/prison-management/article/21138792/corecivic-reports-25m-in-profits-as-covid-infects-2500-inmates; Steven Hale, *Problems Persist at Tennessee's Mismanaged Prisons*, THE NASHVILLE SCENE (Jan. 22, 2020), https://www.nashvillescene.com/news/features/article/21111586/problems-persist-at-tennessees-mismanaged-prisons; Dave Boucher, *CoreCivic investigating ex-officer's allegations of negligent deaths at private prison*, THE TENNESSEAN (Dec. 12, 2017), https://www.tennessean.com/story/news/2017/12/12/corecivic-investigating-ex-officers-allegations-negligent-deaths-private-prison/946196001/; Elizabeth Weill-Greenberg, '*Just Let Him Kick*,' THE APPEAL (Sep. 6, 2018), https://theappeal.org/just-let-him-kick/; Brinley Hineman, *Murfreesboro man charged in prison cellmate's death at Trousdale*, DAILY NEWS JOURNAL (Feb. 20, 2020), https://www.dnj.com/story/news/2020/02/20/murfreesboro-man-jacob-kado-charged-death-prison-cell-mate-ernest-hill-trousdale-turner/4818354002/; Ethan Illers, *Man killed during inmate-on-inmate altercation at Trousdale Turner prison*, WSMV (Jun. 16, 2019), https://www.wsmv.com/news/man-killed-during-inmate-on-inmate-altercation-at-trousdale-turner-prison/article_8d8b6806-9066-11e9-b749-7b44cac1c002.html; Jeremy Finley, *Recorded conversations reveal life inside prison ravaged by COVID-19*, WSMV (May 6, 2020), https://www.wsmv.com/news/investigations/recorded-conversations-reveal-life-inside-prison-ravaged-by-covid-19/article_91ef5b06-8fe2-11ea-9b75-f36db06e1ab1.html; Demetria Kalodimos, *Gang activity, security a concern at Trousdale Turner facility*, WSMV (Jun. 21, 2017), https://www.wsmv.com/news/gang-activity-security-a-concern-at-trousdale-turner-facility/article_df82a358-7073-552e-b5e4-9feb2e9cf8bc.html; Steven Hale, *Tennessee's Largest Prison Still Appears as Troubled as Ever*, THE NASHVILLE SCENE (Feb. 13, 2019), https://www.nashvillescene.com/news/features/article/21047078/tennessees-largest-prison-still-appears-as-troubled-as-ever; Jessie Williams, *Trousdale Turner Corrections Officer Arrested*, MACON COUNTY CHRONICLE (Feb. 5, 2019), https://www.maconcountychronicle.com/news/5680-trousdale-turner-corrections-officer-arrested; Brett Kelman, *At Tennessee's largest prison, diabetic inmates say they are denied insulin to 'maximize profits'*, THE TENNESSEAN (Aug. 7, 2018), https://www.tennessean.com/story/news/2018/08/07/corecivic-diabetic-inmates-denied-insulin-trousdale-turner/925297002/; Natalie Allison, *Lawmakers hear from prison rape survivor, parents of man who hanged himself in CoreCivic facility*, THE TENNESSEAN (Dec. 19, 2018), https://www.tennessean.com/story/news/politics/2018/12/19/tennessee-legislators-hear-rape-suicide-corecivic-prison/2355556002/; Dave Boucher, *Private prison chief: 'We've got work to do' at Trousdale facility*, THE TENNESSEAN (Dec. 13, 2016), https://www.tennessean.com/story/news/2016/12/13/private-prison-chief-weve-got-work-do-trousdale-facility/95223230/; Demetria Kalodimos, *Former chaplain describes conditions inside TN prison*, WSMV (Jun. 19, 2017), https://www.wsmv.com/news/former-chaplain-describes-conditions-inside-tn-prison/article_9b30af82-8297-5101-b11f-b5fd9270bf18.html; Chris Gregory, *Trousdale Turner employee charged with smuggling contraband*, LEBANON DEMOCRAT (Apr. 23, 2020), https://www.lebanondemocrat.com/hartsville/trousdale-turner-employee-charged-with-smuggling-contraband/article_6b865daf-fbc8-5a59-9a35-e84b61ace2e4.html; Andy Cordan, *Prison corrections officer in Trousdale County arrested carrying drugs*, WKRN (Jan. 20, 2021), https://www.wkrn.com/news/prison-corrections-officer-in-trousdale-county-arrested-carrying-drugs/; Dave Boucher, *Gangs, insufficient staffing plague troubled Tennessee private prison, state audit finds*, THE TENNESSEAN (Nov. 14, 2017), https://www.tennessean.com/story/news/politics/2017/11/14/tennessee-private-prison-operated-by-

131.     Defendant Vantell—who was the warden of Whiteville Correctional Facility at the time of Mr. Sullivan's preventable death—was aware of and complicit in Defendant CoreCivic's policies and practices of chronically understaffing and providing deficient medical care to inmates.  He also personally observed their effects every single day he served as warden.

132.     Even so, Defendant Vantell consciously neglected to remedy Whiteville Correctional Facility's chronic understaffing and deficient medical care policies despite his personal knowledge of the extraordinary and frequently fatal consequences that resulted from them.

133.     Due in whole or in part to the above policies and CoreCivic's conscious decision to prioritize profit over providing constitutionally adequate staffing and inmate health care, Mr. Sullivan did not receive any medical treatment for his serious medical needs on June 16, 2021—even though he required immediate hospitalization and despite the fact that immediate hospitalization would have saved his life.

### CLAIM #2: 42 U.S.C. § 1983—DEFENDANTS' DELIBERATE INDIFFERENCE TO MR. SULLIVAN'S MEDICAL NEEDS ON JUNE 17, 2021

134.     The Plaintiffs incorporate and reallege the foregoing allegations as if fully set forth herein.

---

corecivic-blasted-ongoing-problems-new-state-audit/858884001/; Keith Sharon and Adam Tamburin, *'This is unreal': Family seeks answers in death of Trousdale Turner prison inmate*, THE TENNESSEAN (Feb. 2, 2021), https://www.tennessean.com/story/news/2021/02/03/trousdale-turner-inmate-aaron-blayke-adams-dead-family-wants-answers/4290646001/; Alex Corradetti, *Investigation underway following death of inmate at Trousdale Turner Correctional Center*, WKRN (Sep. 8, 2021), https://www.wkrn.com/news/investigation-underway-following-death-of-inmate-at-trousdale-turner-correctional-center/; Chris Gregory, *Former Trousdale Turner corrections officer indicted*, LEBANON DEMOCRAT (Oct. 7, 2021), https://www.lebanondemocrat.com/hartsville/former-trousdale-turner-corrections-officer-indicted/article_aac20d8d-16e5-5edc-9e7e-d5fd9f8bfdoe.html; Levi Ismail, *NAACP calls for closure of Trousdale Turner Correctional Center, cites 'barbaric treatment' of Black men*, WTVF (Nov. 11, 2021), https://www.newschannel5.com/news/naacp-calls-for-closure-of-trousdale-turner-correctional-center-cites-barbaric-treatment-of-black-men.

135.    On June 17, 2021, the medical care that Mr. Sullivan received from the Defendants was so minimal and deficient as to amount to no meaningful treatment at all.

136.    Even after employees of Defendant CoreCivic responded to Mr. Sullivan's cell after his third seizure on June 17, 2021, they delayed his hospitalization by spending time complaining about the smell of Mr. Sullivan's vomit and making jokes about his weight instead of affording him prompt and urgently needed medical care.

137.    After Mr. Sullivan vomited following his third seizure, despite his visibly dire medical needs, and despite his severe head injury and brain swelling, the Defendant Officers Corey Moon, Job Jackson, and Parham dropped Mr. Sullivan to the ground from a height of at least 3 feet in order avoid touching vomit, and they continued to complain and make jokes about the odor thereafter in lieu of affording him prompt and urgently needed medical care.

138.    On June 17, 2021, all Defendants acted with subject and objective deliberate indifference to Mr. Sullivan's serious medical needs; none of them provided any medical care that was of any use in treating Mr. Sullivan's seizures, the blood clot in his leg, or his seizure-induced head injury; all Defendants delayed Mr. Sullivan's hospitalization and deprived Mr. Sullivan of the opportunity to receive timely and effective medical treatment; and all Defendants actively took steps to conceal their deliberate indifference to Mr. Sullivan's serious medical needs after Mr. Sullivan died a preventable death for which the Defendants do not want to be held accountable.

139.    At all times on June 17, 2021, Mr. Sullivan had an objectively serious need for medical treatment that the Defendants failed to provide.

140.    At all times on June 17, 2021, the Defendants subjectively perceived facts from which to infer a substantial risk to Mr. Sullivan's health, they in fact drew an

- 26 -

inference, and they disregarded the risk.

141.   At all times on June 17, 2021, the Defendants consciously disregarded Mr. Sullivan's serious medical needs by delaying his hospitalization and failing to timely hospitalize him.

142.   At all times on June 17, 2021, the Defendants consciously disregarded Mr. Sullivan's serious medical needs by baselessly treating him as if he were overdosing and treating him with anti-overdose medication despite being informed that Mr. Sullivan had not consumed drugs and, instead, had suffered multiple seizures and had a serious and painful knot in his calf.

143.   The Defendants' deliberate indifference to Mr. Sullivan's serious medical needs, their willful decisions to delay his hospitalization, and their failure to hospitalize Mr. Sullivan immediately, at minimum, after he suffered his third seizure in a 24-hour period resulted in Mr. Sullivan's otherwise preventable death.

CLAIM #3: TENNESSEE HEALTH CARE LIABILITY ACT AND DECLARATORY JUDGMENT REGARDING THE INAPPLICABILITY OF CERTIFICATE AND PRE-SUIT NOTICE REQUIREMENTS IN FEDERAL COURT

**HEALTH CARE LIABILITY CLAIMS**

144.   The Plaintiffs incorporate and reallege the foregoing allegations as if fully set forth herein.

145.   Defendant CoreCivic is, for purposes of this action, a "health care provider" as that term is defined by Tenn. Code Ann. § 29-26-101(2).

146.   When treating Mr. Sullivan, CoreCivic had a provider-patient relationship with him.

147.   Mr. Sullivan had no role in selecting who specifically would provide medical care to him.

- 27 -

148. Defendant CoreCivic had a duty to provide Mr. Sullivan appropriate medical care and treatment.

149. Defendant CoreCivic failed to comply with the applicable recognized standard of acceptable professional care ("standard of care") when it provided care and treatment to Mr. Sullivan.

150. The ways in which Defendant CoreCivic failed to comply with the applicable standard of care include, but are not limited to, failing to treat Mr. Sullivan after he filed an emergency medical report regarding his calf condition; failing to treat Mr. Sullivan's seizure-induced head contusion; misdiagnosing Mr. Sullivan as experiencing a drug overdose after he suffered his third seizure in a 24-hour period despite having no evidence that he was actually experiencing an overdose (and in fact having evidence that he was specifically *not* experiencing an overdose); and failing to diagnose or treat, in any respect, Mr. Sullivan's developing blood clot in his calf.

151. All of the above acts also constituted reckless conduct, and all Defendants undertook efforts to conceal what actually occurred.

152. As a direct and proximate result of the Defendants' actions, Mr. Sullivan died.

## DECLARATORY JUDGMENT THAT HCLA STATUTORY CERTIFICATE AND PRE-SUIT NOTICE REQUIREMENTS ARE INAPPLICABLE TO CLAIMS FILED IN FEDERAL COURT

153. Pursuant to *Albright v. Christensen*, 24 F.4th 1039, 1045–48 (6th Cir. 2022), the statutory certificate of good faith and pre-suit notice requirements of Tennessee's Health Care Liability Act conflict with the Federal Rules of Civil Procedure and accordingly do not apply in federal court.

154. Thus, pursuant to 28 U.S.C. § 2201, the Plaintiffs seek a declaration that the

- 28 -

statutory certificate of good faith and pre-suit notice requirements of Tennessee's Health Care Liability Act conflict with the Federal Rules of Civil Procedure and do not apply to or preclude the Plaintiffs' state law tort claim in this action.

<u>CLAIM #4: LOSS OF CONSORTIUM</u>

155.    The Plaintiffs incorporate and reallege the foregoing allegations as if fully set forth herein.

156.    Tennessee allows for an award of filial consortium and other damages for the death of one's child under Tenn. Code Ann. § 20–5–113.  *See Hancock v. Chattanooga-Hamilton Cty. Hosp. Auth.*, 54 S.W.3d 234, 236 (Tenn. 2001).

157.    The Defendants' wrongful acts, faults, omissions, and tortious misconduct caused the Plaintiffs to suffer filial consortium and other damages arising from the death of their beloved son.

158.    Accordingly, the Plaintiffs are entitled to an award of damages including the pecuniary value of Mr. Sullivan's life and the loss of their son's attention, guidance, care, protection, companionship, cooperation, affection, and love.

## VI.  PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for the following relief:

1.  That proper process issue and be served upon the Defendants, and that the Defendants be required to appear and answer this Complaint within the time required by law;

2.  That the Plaintiffs be awarded all compensatory, consequential, and incidental damages to which Plaintiffs are entitled in an amount not less than $2.5 million;

3.  That the Plaintiffs be awarded punitive damages in an amount not less than $7.5

million;

4. That the Plaintiffs be awarded their reasonable attorney's fees pursuant to 42 U.S.C. § 1988(b);

5. That this Court declare that the statutory certificate of good faith and pre-suit notice requirements of Tennessee's Health Care Liability Act conflict with the Federal Rules of Civil Procedure and do not apply to or preclude their state law tort claim in this action;

6. That a jury of 12 be empaneled to try this cause;

7. That pre-judgment and post-judgment interest be awarded to the Plaintiffs;

8. That the Plaintiffs be awarded all further relief to which they are entitled.

Respectfully submitted,

/s/ Daniel A. Horwitz_____
Daniel A. Horwitz, BPR #032176
HORWITZ LAW, PLLC
4016 Westlawn Dr.
Nashville, TN 37209
daniel@horwitz.law
(615) 739-2888

*Counsel for Plaintiffs*